UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONARDO JOSEPH RANGEL,<br><br>   Plaintiff,<br><br>   v.<br><br>D. LATRAILLE, et al.,<br><br>   Defendants. | Case No.: 1:10-cv-01790-AWI-BAM (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 56) |

**I.     Background**

Plaintiff Leonardo Joseph Rangel ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's first amended complaint, filed January 9, 2012, against Defendant LaTraille and Taber[1] for excessive force in violation of the Eighth Amendment, retaliation in violation of the First Amendment and assault and battery under state law. (ECF No. 17.)

On June 7, 2013, Defendants filed a motion for summary judgment. (ECF No. 56.) On August 2, 2013, Plaintiff opposed the motion. (ECF No. 76.) Defendants did not reply. The motion is deemed submitted. Local Rule 230(l).

---

[1] Defendants were erroneously sued as "D. Latraille" and "J. Tabor" in the first amended complaint.

1

**II.       Defendants' Motion for Summary Judgment**

   **A. Legal Standard for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to liberally construe the filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (internal quotations and citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not undertake to scour the record for triable issues of fact.  Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

In arriving at this order, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any,

1 objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## B. Summary of Relevant Allegations in Plaintiff's First Amended Complaint

In February 2008, staff at Corcoran State Prison began conducting unclothed body inspections outdoors on the yard per a memorandum authored by Warden Adams. The memo ordered staff to conduct these searches even when no emergency or security situation existed. As a result of the memo, Plaintiff was forced to strip completely nude in the yard in plain view of staff and inmates, including staff of the opposite sex. Due to the public strip searches, Inmate John Martinez filed a group 602 appeal.

On March 12, 2008, Plaintiff and Inmate Martinez met with correctional employees in the Institutional Classification Room to discuss public strip searches. At the meeting, Inmate Martinez was the most vocal.

On March 12, 2008, Plaintiff was informed that female staff would not be present during strip searches and that privacy screens would be installed to obscure the view from the program office.

On March 15, 2008, Plaintiff attended the exercise yard area and during yard recall Correctional Officers Silva and others ordered Plaintiff to "strip out" and refused to remove Plaintiff from the exercise yard unless he did so. Plaintiff explained to staff that he was willing to submit to an unclothed body inspection, but requested that it be conducted in a holding cell to afford some measure of privacy. Plaintiff repeated the request many times, but his requests were disregarded. Plaintiff was left outside in the cold weather for hours with no lunch or dinner. While on the exercise yard, Plaintiff's personal property was removed from his cell.

On March 16, 2008, after more than 14 hours, Plaintiff was subjected to unnecessary and excessive force for the purpose of subjecting him to a public strip search. Lt. Hubach ordered Plaintiff to an unclothed body inspection. Defendants LaTraille and Taber repeatedly pepper sprayed Plaintiff with five cans of pepper spray: OC-MK-9 (1 full can); OC MK-46 (1 full can); OC k505 (1 full can); and OC-T-16 OC Grenade (2 full cans). Plaintiff's body, face, eyes, hair, legs, genitals and anus were

completely saturated with chemicals. The spray caused a sudden change in temperature on Plaintiff's body from freezing to hot and burning.

After being sprayed with chemicals, Plaintiff was forced to strip naked, inspected and walk naked to the front of 4B SR where water was sprayed on him from a water hose for approximately 60 to 70 seconds to unsuccessfully decontaminate him. Plaintiff was then placed in his cell, which was stripped clean of all articles of necessity, leaving only a mattress. Plaintiff could not see, his breathing was erratic and his body was twitching. Plaintiff suffered these effects for approximately 8 hours. Plaintiff was without sheets, blankets, clothing, towels, toilet paper or hygiene items until March 18 or 19, 2008. Plaintiff's request for eating utensils and toilet paper were ignored and Plaintiff was forced to use his hands to eat.

**C.     Statement of Undisputed Material Facts ("UMF")**

1. Plaintiff has been incarcerated on Facility 4B at California State Prison-Corcoran (COR) since October 24, 2007. (Defs' Ex. A, Attachment 1.)

2. Facility 4B is the security housing unit ("SHU"). (Defs' Ex. B, Hubach Dec. ¶ 3.)

3. The SHU houses inmates who have been found guilty in disciplinary proceedings of committing acts of violence against staff or other inmates, possessing or distributing illegal narcotics and other contraband, associating with or belonging to a gang, promoting illegal gang activity, or engaging in other activity or conduct that threatens the safety and security of the institution, staff, and inmates that make them ineligible for housing in the general population. (Defs' Ex. B ¶ 3; Defs' Ex. C, Adams Dec. ¶ 4.)

4. Movement and inmate activities in the SHU are primarily governed by COR Operational Procedure No. 222. (Defs' Ex. C ¶ 5; Defs' Ex. B ¶ 4.)

5. SHU inmates are provided with three to four hours of yard time in the exercise modules (cages) on the small management yard (SMY) on Facility 4B. But inmates are not required to go to yard. (Defs' Ex. B ¶ 5; Defs' Ex. C ¶ 6; Defs' Ex. D, COR 2007 Operational Procedure No. 222, § 102(D)(3).)

4

6. Before August 2007, SHU inmates returning from the exercise modules were placed in a holding cell in the entrance (rotunda) area of the housing unit and underwent an unclothed body search. (Defs' Ex. D, § 504(F).)

7. An unclothed body search consisted of an inmate removing all clothing and handing it to the officers, running his hands over his head, flipping his ears forward with his hands, running a finger through the inside of his mouth, lifting his genitals, turning and bending at the waist, and squatting and coughing. The officers did not physically touch the inmate, and the entire process lasted about a minute. (Defs' Ex. B, ¶ 6.)

8. On August 1, 2007, D. Adams, the Warden at COR, issued a directive requiring that all SHU inmates undergo an unclothed body search before they were removed from the exercise modules on the SMY. This strip search policy went into effect on August 20, 2007. (Defs' Ex. C ¶¶ 1-2, 8; Defs' Ex. E, Memorandum.)

Plaintiff attempts to raise a genuine dispute of material fact by arguing that he was unaware of any policy change until February 2008 and that Warden Adams did not follow proper administrative procedures. (ECF No. 76, p. 27-28.)[2] Plaintiff's assertions do not raise a triable issue of fact regarding the date Warden Adams issued his directive or the effect of that directive.

9. The strip search policy was incorporated into Operational Procedure No. 222 by way of addendum signed by Adams and dated August 2007. (Defs' Ex. C ¶ 8; Defs' Ex. F, addendum.)

Plaintiff attempts to dispute this addendum by claiming that Defendants' Exhibit is a false document. To support his claim, Plaintiff has submitted an addendum dated April 2008, which also includes the proposed revision of the operational procedure, along with additional revisions. (ECF No. 76, pp. 28-29, Pl's Ex. E.) Plaintiff's evidence does not support his contention that Defendants' exhibit is a false document and does not raise a triable issue of material fact.

10. The only difference between the strip searches before and after August 20, 2007, was the location of where the search was conducted. (Defs' Ex. B, ¶ 7.)

---

[2]  Page citations correlate to the Court's CM/ECF pagination.

5

Plaintiff attempts to raise a dispute be contending that inmates were not aware of the change until February 2008. (ECF No. 76, p. 31.) This does not raise a triable issue of material fact regarding the nature of the policy change.

11. In October 2007, Operational Procedure No. 222 was revised to incorporate Warden Adams' change to the strip search policy. Due to some ambiguity in the policy's language, Adams issued another addendum in April 2008 to clarify that the search was to be conducted before the inmate exited the exercise module. (Defs' Ex. D, §§ 102(E)(8), 504(F); Defs' Ex. K, 2008 Addendum.)

Plaintiff argues that there was no revision of the policy. (ECF No. 76, p. 31.) However, Operational Procedure 222 in effect on October 2007 provided that all inmates returning from the exercise yard would be subject to an unclothed body search prior to returning to their assigned cell. (Defs' Ex. D, §§ 102 (E)(8), 504(F).) An April 2008 addendum clarified that inmates must submit to an unclothed body search prior to being restrained and escorted from the Small Management Yard. (Defs' Ex. K.)

12. Around noon on March 15, 2008, Plaintiff was escorted to the small management yard on Facility 4B and placed in an exercise module. (First Amended Complaint ("FAC") ¶ 25.)

13. Around 3:30 or 4 p.m., Officer Silva ordered Plaintiff to submit to an unclothed body search before exiting the exercise module. Plaintiff refused to comply with the officer's order. (FAC ¶ 25.)

Plaintiff disputes this fact by contending that he agreed to "cuff up" and be taken indoors to the rotunda holding cell to be strip searched. (ECF No. 76, p. 32.) This does not raise a genuine dispute. Plaintiff's contention contains an inherent admission that he refused to submit to an unclothed body search <u>before</u> exiting the exercise module.

14. In addition to Plaintiff, 74 other inmates refused to submit to the required strip search as a protest to the change in the search policy and its purported inconsistent enforcement and implementation. (Defs' Ex. B ¶ 8.)

15. Lieutenant Hubach ordered staff to counsel the inmates and persuade them to comply with the lawful orders to submit to the required search. (Defs' Ex. B ¶ 8.)

6

1       16.     Hubach also notified his supervisors of the inmates' disruption to the yard program and
2 schedule. (Defs' Ex. B ¶ 8.)

3       17.     By the late evening on March 15, 2008, 67 inmates, including Plaintiff, still refused to
4 comply with staff's orders to submit to the required search. (Defs' Ex. B ¶ 9.)

5       Plaintiff again attempts to raise a dispute by contending that he agreed to submit to an
6 unclothed body search.  (ECF No. 76, p. 32.) However, as noted above, Plaintiff did not agree to
7 submit to such a search <u>before</u> exiting the exercise module.  Plaintiff has not raised a genuine dispute
8 of material fact.

9       18.     At approximately 10:40 p.m., Administrative Officer of the Day (AOD) Leon
10 assembled two tactical teams to extract the inmates from the exercise modules, and he authorized the
11 use of pepper spray to compel the inmates' compliance with lawful orders to submit to a strip search
12 before exiting the exercise modules. (Defs' Ex. A-1, Bates No. 00023.)

13       19.     Hubach was the team leader of Extraction Team 1, which included Sergeants LaTraille
14 and Taber. (Defs' Ex. B ¶ 12; Defs' Ex, G, LaTraille Declaration, ¶¶ 1-3; Defs' Ex. H, Taber
15 Declaration. ¶¶ 1-3.)

16       20.     At approximately 2:28 a.m. on March 16, 2008, Hubach approached Plaintiff's exercise
17 module and read Plaintiff an admonishment to submit to an unclothed body search or he would be
18 forcefully removed from the module. (Defs' Ex. B ¶ 20; Defs' Ex. I, Extraction Video.)

19       21.     Hubach ordered Plaintiff to submit to the required search. Plaintiff refused to comply
20 with Hubach's order. (Defs' Ex. B ¶ 20; Defs' Ex. I.)

21       22.     Hubach ordered LaTraille and Taber to use force to compel Plaintiff's compliance with
22 his order. (Defs' Ex. B ¶ 20; Defs' Ex. G ¶ 7; Defs' Ex. H ¶ 8; Defs' Ex. I.)

23       Plaintiff attempts to raise a dispute by contending that Defendants LaTraille and Taber used
24 excessive force.  (ECF No. 76, p. 33.)  This does not raise a genuine dispute of material fact regarding
25 the substance of Hubach's order to Defendants LaTraille and Taber.

26       23.     Plaintiff was wearing a tee shirt pulled up over his head, and boxer shorts, and was in a
27 tucked position on the ground with his arms over his head. (Defs' Ex. I.)

28

1 24. LaTraille and Taber used multiple bursts of pepper spray from an MK-9, MK-46, Z-505, or a combination of these types of spray on Plaintiff. (Defs' Ex. G ¶ 8; Defs' Ex. H ¶ 9; Defs' Ex. I.)

Plaintiff attempts to raise a dispute by complaining about the number of bursts of spray and the types of spray used. (ECF No. 76, pp. 33-34.) However, Defendants admit that multiple bursts of different sprays were used from different canisters.

25. Due to Plaintiff being so covered up, LaTraille and Taber aimed for Plaintiff's body generally, and the spray landed on his arms, legs, sides, and back. Plaintiff covered the majority of his upper body and head with the jumpsuit. (Defs' Ex. G ¶ 9; Defs' Ex. H ¶ 10; Defs' Ex. I.)

26. On at least one occasion, Defendants Taber and LaTraille stopped spraying to give the pepper spray a chance to work. (Defs' Ex. G ¶ 10; Defs' Ex. H ¶ 11; Defs' Ex. I.)

27. LaTraille and Taber did not kick, hit, punch, or strike Plaintiff or use their batons on him. (Defs' Ex. I.)

28. LaTraille and Taber conducted the unclothed body search of Plaintiff, and Plaintiff was escorted to an area outside the housing unit for decontamination and medical evaluation. (Defs' Ex. G ¶ 12; Defs' Ex. H ¶ 13; Defs' Ex. I.)

Plaintiff attempts to raise a dispute by contending that Defendants did not conduct a search. However, Plaintiff admits that Defendants "got Plaintiff naked." (ECF No. 76, p. 35.) This is not a genuine dispute of material fact. Furthermore, it is not relevant to Plaintiff's claims of excessive force, retaliation or assault and battery.

29. Departmental policy required that an inmate be provided with copious amounts of running water or fresh air after exposure to pepper spray, and COR's customary practice was to provide an inmate with a shower depending on the level of exposure to pepper spray. (Defs' Ex. J, Leon Declaration ¶ 13.)

Plaintiff contends that he was denied proper decontamination. (ECF No. 76, p. 39.) Plaintiff's factual assertions do not raise a genuine dispute concerning the requirements of departmental policy.

30. Inmates were escorted to their cells where they had access to running water to further decontaminate. (Defs' Ex. J ¶¶ 12-14.)

8

1  31. Plaintiff was taken to his cell after his medical evaluation, where he had water from the sink to further decontaminate. (FAC ¶ 38.)

3  32. Plaintiff felt "hot" for three days after being peppers sprayed. (FAC 38; Defs' Ex. A-1, p. 41.)

5  33. At no time when Plaintiff was in the exercise module did he call out to any Defendant and request food, clothing, blankets, or water. (Defs' Ex. B ¶ 22; Defs' Ex. J ¶¶ 18-19.)

### D.  Discussion

Defendants argue that summary judgment should be granted because: (1) Plaintiff cannot prove retaliation because Defendants' actions were not based on protected conduct, but rather were based on Plaintiff's refusal to comply with a valid order—the strip-search policy that was reasonable and advanced a legitimate correctional purpose; (2) Defendants' use of force to compel Plaintiff's compliance with the strip-search policy was reasonable, minimal and necessary; (3) Plaintiff did not inform either defendant that he needed further decontamination, blankets, or food; (4) Plaintiff's claims for assault and battery fail because the force used by Defendants was reasonable, and (5) Defendants are entitled to qualified immunity since they did not violate Plaintiff's constitutional rights and their conduct was objectively reasonable. (ECF No. 56-1, p. 7.)

To the extent Defendants argue that the Court should grant summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim (ECF No. 56-1, pp. 22-25), the Court finds it unnecessary to reach this issue. On January 18, 2012, the Court limited the scope of this action and allowed Plaintiff to proceed against Defendants LaTraille and Taber for "excessive force in violation of the Eighth Amendment, retaliation in violation of the First Amendment, and assault and battery under state law." (ECF No. 17, p. 15.) The Court dismissed Plaintiff's remaining claims under the Eighth Amendment, including Plaintiff's conditions of confinement claim, with prejudice, for failure to state a claim. (ECF No. 17, pp. 5-6, 15.)

Accordingly, the Court confines it consideration of Defendants' motion for summary judgment to the following claims: (1) Plaintiff's claim of excessive force in violation of the Eighth Amendment; (2) Plaintiff's claim of retaliation in violation of the First Amendment; and (3) Plaintiff's state law

1 claims for assault and battery. The Court also will consider Defendants' assertion that they are
2 entitled to qualified immunity.

### 1. Excessive Force in Violation of the Eighth Amendment

Plaintiff claims that Defendants LaTraille and Taber used excessive force in violation of the Eighth Amendment on March 16, 2008. The relevant inquiry for this claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7, 112 S. Ct. 995, 998 (1992); Whitley v. Albers, 475 U.S. 312, 320, 106 S. Ct. 1078, 1085 (1986). In making this determination, the court may evaluate "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." Whitley, 475 U.S. at 321, 106 S. Ct. at 1085; Marquez v. Gutierrez, 322 F.3d 689, 692 (9th Cir. 2003).

However, "not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178 (2010) (quoting Hudson, 503 U.S. at 9, 112 S. Ct. at 1000). The Eighth Amendment's prohibition of cruel and unusual punishments "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 37-38. "An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." Id. at 38.

In this case, Plaintiff asserts that there was no need for the use of force because he agreed to submit to an unclothed body search indoors, he was not physically or verbally threatening and there was no reasonable suspicion that he had weapons or contraband on his person. (ECF No. 76, p. 17.) However, it is undisputed that correctional officers were faced with 67 inmates, including Plaintiff, who refused to submit to an unclothed body search before exiting the exercise module despite counseling and repeated orders to comply. (UMF 12-17; ECF No. 76, Pl's Opp'n p. 7.) As is evidenced by the undisputed facts, some measure of force was necessary based on the prisoners' concerted lack of compliance. Correctional officials are not required to concede to the demands of inmates or wait them out in order to avoid the use of force. Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir.1984) ("experience and common sense establish that a prison cannot be operated in such a way").

1    Although some measure of force was needed to gain the inmates' compliance, the Court finds a
2    genuine dispute of material fact regarding the relationship between the need for force and the amount
3    of force used on Plaintiff.  It is undisputed that Plaintiff and multiple other prisoners refused to comply
4    with orders to submit to an unclothed body search in the exercise module.  However, in Defendants'
5    version of the facts, they administered no more pepper spray than was necessary to compel Plaintiff's
6    compliance and they did not use pepper spray excessively. (Defs' Ex. G ¶¶ 14-15; Defs' Ex. H, ¶¶ 15-
7    16.)  In Plaintiff's version of events, Defendants used 53 to 63 bursts of different chemical sprays from
8    approximately four canisters to completely saturate him (ECF No. 76, pp. 16, 34, 37; Pl's Ex. A, p. 48,
9    ¶ 14), and Defendants sprayed him after he was complying with orders. (ECF No. 76, Pl's Ex. N, p.
10   202 ¶¶ 4-6.)  These alternative versions create a triable issue of material fact.  Further, the extraction
11   video appears to show Defendants utilizing multiple canisters of spray to saturate Plaintiff while he
12   remained on the ground in a tucked position and then administering bursts of spray after Plaintiff stood
13   up. (Defs' Ex. 1.)  The extraction video creates a triable issue of fact regarding whether or not the use
14   of multiple canisters of pepper spray to saturate Plaintiff was necessary to gain his compliance with
15   the order to submit to an unclothed body search and whether or not Defendants continued to spray
16   Plaintiff after he attempted to comply with orders.  The Court cannot conclude that the amount of
17   force was *de minimis* and equivalent to a single push or shove.  Wilkins, 559 U.S. at 38.  A reasonable
18   jury could conclude that Defendants LaTraille and Taber used an excessive amount of force in the
19   circumstances by saturating him with chemical spray and continuing to spray him after his attempt to
20   comply.  Thus, Plaintiff has established a genuine issue for trial.
21       Furthermore, the Court does not make credibility determinations or weigh conflicting evidence
22   at this stage of the proceedings.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. Nov.
23   27, 2007).  Instead, the Court must draw all inferences in the light most favorable to the non-moving
24   party.  Id.  In this instance, a jury might find Plaintiff credible and, after viewing the extraction video,
25   find the use of force excessive.  As such, the Court will recommend that Defendants' motion for
26   summary judgment on Plaintiff's claim of excessive force in violation of the Eighth Amendment be
27   denied.
28   ///

### 2. State Law Claims: Assault and Battery

As there is a genuine dispute as to whether excessive force was used, as explained above, the Court will recommend that Defendants' motion for summary judgment on Plaintiff's state law assault and battery claim be denied. See, e.g., Carrasco v. Campagna, 2005 WL 2171884, *6 n.12 (N.D. Cal. Aug. 30, 2005) (denying summary judgment on state-law claims of assault and battery because they were based on the same disputed facts as state prisoner's Eighth Amendment excessive force claim).

### 3. Retaliation in Violation of the First Amendment

Within the prison context "a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir.2005); accord Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir.2009). The court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir.1995) (quoting Sandin v. Conner, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). The burden is on plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the actions he complains of." Pratt, 65 F.3d at 808.

The First Amendment protects the right of a prisoner to file a prison grievance against prison officials. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003). However, protests that involve direct confrontation with prison officials enjoy limited constitutional protection due to the danger of a prison disturbance. Nunez v. Ramirez, 2010 WL 1222058, *5-6 (S.D. Cal. Mar. 24, 2010); Johnson v. Carroll, 2012 WL 2069561, *34 (E.D. Cal. Jun. 7, 2012) (findings and recommendations finding that prisoner's verbal challenge to search was not protected by First Amendment; prisoner's recourse for challenging search was to file an administrative grievance), adopted in full by Johnson v. Carroll, 2012 WL 3756483 (E.D. Cal. Aug. 28, 2012). Even if characterized as a protest, a refusal to comply with a direct order is not subject to First Amendment protection. See, e.g., Cauthen v. Rivera, 2013 WL 1820260, *8-9 (E.D. Cal. Apr. 30, 2013) (objection to outdoor search characterized by prisoner as a

grievance by way of peaceful protest not protected; prisoner's conduct was an objection to a direct order in face-to-face confrontation and did not state a claim for retaliation).

Here, it is undisputed that the protest was a direct, face-to-face confrontation with prison officials and resulted in the refusal of 67 inmates, including Plaintiff, to comply with repeated orders to submit to an unclothed body search before exiting an exercise module.[3] (UMF 12-17.) Plaintiff's refusal to comply with orders is not protected conduct under the First Amendment. Inmates do not get to decide which orders they will obey and when they will obey them. Soto, 744 F.2d at 1267.

Assuming *arguendo* that the protest at issue was considered protected conduct, Plaintiff has not raised a genuine dispute of fact that the use of force failed to reasonably advance a legitimate penological purpose. The California Department of Corrections and Rehabilitation's regulations prohibit conduct that disrupts the operation of the institution. Specifically, the regulations provide as follows: "Inmates . . . will not openly display disrespect or contempt for others in a manner intended to or reasonably likely to disrupt orderly operations within the institutions or to incite or provide violence." Cal. Code Regs., tit. 15 § 3004(b). Defendants have established that the use of force to gain the compliance of more than 60 inmates advanced the valid penological goal of maintaining institutional order and security. Institutional security is a legitimate correctional goal. Nevada Dep't of Corr. v. Greene, 648 F.3d 1014, 1018 (9th Cir. 2011). Plaintiff has not raised a genuine dispute of material fact that Defendants' use of force did not advance a legitimate penological goal.

For these reasons, the Court will recommend that Defendants' motion for summary judgment be granted on Plaintiff's claim of retaliation in violation of the First Amendment.

///

///

///

---

[3] The parties spend considerable time arguing the validity of the unclothed body searches of inmates in the exercise modules. In its screening order, the Court determined that Plaintiff's allegations were insufficient to state a claim that the strip searches at issue violated the Fourth or Eighth Amendments to the United States Constitution. (ECF No. 17, pp. 4-5, 7-8.) Therefore, the Court finds it unnecessary to address Plaintiff's claim that the search policy requiring unclothed body searches prior to exiting the exercise module was unconstitutional. It was the effective policy during the relevant time period and it is unnecessary to determine its constitutionality in assessing Plaintiff's claims of excessive force, retaliation and assault and battery.

**4.     Qualified Immunity**

As a final argument, Defendants argue that they are entitled to qualified immunity. In light of the above findings, the Court addresses this argument only with respect to Plaintiff' excessive force claim.

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (citations omitted). To determine if an official is entitled to qualified immunity the court uses a two part inquiry. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001) overruled in part by Pearson v. Callahan, 555 U.S. at 236, 129 S.Ct. at 818. The court determines if the facts as alleged state a violation of a constitutional right and if the right was clearly established at the time of the challenged conduct. Ashcroft, 131 S.Ct. at 2080. This does not require that the same factual situation must have been decided, but that existing precedent would establish the statutory or constitutional question beyond debate. Id. at 2083; Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir.2011). The inquiry as to whether the right was clearly established is "solely a question of law for the judge." Dunn v. Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep' t., 556 F.3d 1075, 1085 (9th Cir. 2009)). District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S.Ct. at 818.

Having determined that Plaintiff has raised a genuine issue of material fact as to whether there was a constitutional violation, the Court must determine whether the right was clearly established. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (citation omitted). Official action is

14

entitled to protection "unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d 898, 906 (9th Cir.2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," Hope, 536 U.S. at 741. The salient question is whether the state of the law in March 2008 gave Defendants fair warning that their alleged treatment of Plaintiff was unconstitutional. Hope, 536 U.S. at 741 (quotation marks omitted).

By 2008, the prohibition against the use of excessive force was clearly established. Hudson, 503 U.S. at 6–7. Assuming the facts in the light most favorable to Plaintiff, no reasonable officer would have believed that it was necessary to saturate a prisoner with multiple bursts of pepper spray from several different canisters to gain compliance in the absence of significant provocation from Plaintiff. Accordingly, the Court finds that Defendants are not entitled to qualified immunity on Plaintiff's excessive force claim.

### III. Conclusion and Order

For the reasons discussed above, IT IS HEREBY RECOMMENDED that Defendants' motion for summary judgment, filed on June 7, 2013, be GRANTED IN PART and DENIED IN PART as follows:

1. Defendants' motion for summary judgment on Plaintiff's claim of excessive force in violation of the Eighth Amendment and on Plaintiff's claim of assault and battery in violation of state law be denied;

2. Defendants' motion for summary judgment on Plaintiff's claim of retaliation in violation of the First Amendment be granted;

3. Defendants' motion for qualified immunity on Plaintiff's claim of excessive force be denied; and

4. This matter be set for jury trial on Plaintiff's claims of excessive force in violation of the Eighth Amendment and assault and battery under state law against Defendants LaTraille and Taber.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 20, 2014**                    /s/ *Barbara A. McAuliffe*
                                                UNITED STATES MAGISTRATE JUDGE