1
2
3
4
5
6
7
8

9 **UNITED STATES DISTRICT COURT**

10 **EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  LEONARDO JOSEPH RANGEL, | )  Case No.: 1:10-CV-01790-BAM (PC) |
| 12           Plaintiff, | )  **PRETRIAL ORDER** |
| 13      v. | )  Motions in Limine Filing Deadline: March 21, 2016 |
| 14  D. LATRAILLE, et al., | )  Opposition to Motions in Limine Filing Deadline: March 29, 2016 |
| 15           Defendants. | )  |
| 16 | )  Motion in Limine Hearing: April 19, 2016 at 10:00 am. in Courtroom 8 (BAM) |
| 17 | )  |
| 18 | )  **Jury Trial**: May 3, 2016, at 8:30 a.m. in Courtroom 8 (BAM) – 4 days |
| 19 | ) |

20      Plaintiff Leonardo Joseph Rangel ("Plaintiff") is a former state prisoner proceeding in forma

21 pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's

22 claims of excessive force in violation of the Eighth Amendment, and assault and battery under state

23 law, against Defendants D. LaTraille and J. Taber (erroneously sued as "J. Tabor"). All parties have

24 consented to magistrate judge jurisdiction. (ECF Nos. 9, 93).

25      The parties submitted pretrial statements, and on March 15, 2016, the Court held a telephonic

26 trial confirmation hearing. Counsel for Plaintiff and Defendants attended the hearing. Having reviewed

27 the parties' statements and the remainder of the file, and having considered the issues raised at the

28 telephonic trial confirmation hearing, the Court issues the instant pretrial order.

**I.     Jurisdiction and Venue**

The Court has subject matter jurisdiction over this federal civil rights action. 28 U.S.C. § 1331. Venue is proper because the conduct allegedly occurred in this judicial district. 28 U.S.C. § 1391.

**II.    Trial**

The parties demand a trial by jury. Fed. R. Civ. P. 38(b).

Trial is set for **May 3, 2016 at 8:30 a.m.** before U.S. Magistrate Judge Barbara A. McAuliffe in Courtroom 8 (BAM). The parties anticipate the trial will last approximately four (4) days.

**III.   Facts**

**A.     Plaintiff's Undisputed Facts**

Plaintiff contend the following facts are undisputed:

1.      Plaintiff was incarcerated on Facility 4B at California State Prison Corcoran since October 24, 2007.

2.      Facility 4B is a Security Housing Unit.

3.      Movement and inmate activities in the Security Housing Unit are primarily governed by Corcoran Operational Procedure No. 222.

4.      Inmates in the Security Housing Unit are provided with three to four hours of time in 1-2 man exercise cages that are located in the small management yard next to Facility 4B (hereinafter referred to as the Exercise Yard).

5.      Inmates were required to submit to a strip search and visual cavity inspection both before and after visiting the Small Management Yard (hereinafter referred to as the "Exercise Yard").

6.      On August 1, 2007, Warden Darral Adams issued a directive requiring that all inmates undergo an unclothed body search prior to removal from the Exercise Yard. This security measure was issued to help ensure inmates are free of all contraband prior to escort.

7.      In October 2007, Operational Procedure No. 222 was revised to incorporate Warden Adams' change to the strip search policy. Due to some ambiguity in the policy's language, Adams issued another addendum in April 2008 to clarify that the search was to be conducted before the inmate exited the exercise cage.

///

2

8.      A strip search consists of an inmate removing all clothing, handing it to the officers. The staff then inspects and searches each item of clothing. Initially the inmate must face the staff member who inspects the hair, ears, nose, mouth, armpits, hands, scrotum and legs. The inmate is required to run his hands over his head, flipping his ears forward with his hands, running a finger through the inside of his mouth, lifting his genitals. The naked inmate is swiped with a hand held metal detector. The inmate then turns and bends at the waist for a visual inspection of the back, buttocks, thighs, toes, bottom of the feet and anal area. The inmate is required to squat, spread the cheeks of his buttocks and cough. The staff conducts a visual cavity inspection. The purpose of the strip search is to identify and confiscate any contraband in the inmate's possession.

9.      Before February 2008, the strip searches were conducted in private, within a rotunda, hallway or section holding cell. Only one inmate could occupy a holding cell during unclothed body search and no unclothed body searches could be conducted in a cell, yard, sally port or section door. Inmates returning from the exercise yard were placed into a holding cell in the entrance (rotunda) area of the housing unit and underwent the unclothed body search.

10.     After February 2008, the officers were performing the strip searches in the exercise cage and/or outside the exercise cage in the exercise yard.

11.     Implementation of the change in policy for unclothed body searches resulted in the staff performing the strip and body cavity searches in full view of the both male and female staff members, and the other inmates.

12.     Implementation of the change in policy resulted in full public exposure of the inmates' buttocks, genitals, anus and other body parts and conditions.

13.     Public strip searches in plain view of the male and female staff and other prisoners subjects these individuals to embarrassment, humiliation and open ridicule.

14.     In or about March 2008, inmate John Martinez filed a group 602 appeal in an attempt to stop the public strip searches.

15.     On March 12, 2008, John Martinez and plaintiff Leonardo Rangel met with prison staff to express their concerns about the public strip searches.

///

3

16.     Mr. Rangel and Mr. Martinez were told that female staff would not be present during strip searches and a privacy screen would be installed to obscure the view of the Small Management Yard from the program office.

17. On March 15, 2008, Mr. Rangel participated in a non-violent protest of the public strip searches.

18.     Around noon on March 15, 2008, Mr. Rangel submitted to a strip and body cavity search in his cell and was then escorted to the Exercise Yard on Facility 4B and locked into an exercise cage.

19.     Around 3:30 or 4:00 p.m., Officer Silva came to Randel's exercise cage to conduct a strip and visual cavity search before returning to the facility.

20.     Mr. Rangel did not refuse to leave the Exercise Cage.

21.     Mr. Rangel did not refuse to undergo a strip and cavity search.

22.     Mr. Rangel agreed to submit to a strip and visual cavity search outside of view of female staff and other inmates.

23.     Mr. Rangel did not become aggressive at any time herein.

24.     Mr. Rangel did not get violent at any time herein.

25.     Mr. Rangel did not become threatening at any time herein.

26.     Mr. Rangel did not become confrontational at any time herein.

27.     There was no reasonable suspicion that Mr. Rangel had weapons or contraband on his person.

28.     Seventy-four other inmates in the exercise yard that afternoon communicated their unwillingness to participate in a public strip and visual cavity search in a peaceful protest of the public strip and cavity search.

29.     The morning shift of inmates in the exercise yard had likewise expressed their unwillingness to participate in the public strip search.

30.     They were handcuffed and escorted to the holding cell in the entrance (rotunda) area of the housing unit and underwent a private unclothed body search just as they had at all times before February 2008.

31.     Upon learning of the afternoon protest, D. Leon, the Administrative Officer of the Day, ordered that the afternoon prisoners remain in the cages without food, water or additional clothing.

32.     The weather that evening dipped down to 41 degrees.

4

33.     Every request for food, blankets or additional clothing was denied.

34.     At or about 10:30 p.m. two Extraction Teams were deployed with canisters of Oleoresin Capsicum (commonly known as "Pepper Spray".)

35.     At 2:28 a.m., after l4 hours in the exercise cage, with no food and freezing temperatures, Extraction Team #1, lead by Lieutenant Hubach, approached Plaintiff Rangel's cage with the camera rolling. Lieutenant Hubach read a paper ordering Mr. Rangel to submit to the required public strip and visual cavity search.

36.     Rangel, lying in a fetal position on the floor of the cage, did not verbally respond.

37.     Defendant Sergeants D. LaTraille and J. Taber were ordered by Lieutenant Hubach to "use minimal force to compel the inmate's compliance."

38.     Thereafter, Lieutenant Hubach, Officer Anderson and LVN watched while Sergeants D. LaTraille and J. Taber emptied seven pepper spray canisters onto Mr. Rangel over a 3.5 minute time period.

39.     The California State Prison at Cocoran has a Confidential Use of Force Policy Operational Procedure No. D10. The policy proscribes up to five, 2 second bursts of pepper spray, followed by a ten to fifteen minute "cool down" period.

40.     Plaintiff's entire body, face, back, legs, genitals and anus were completely saturated from the multiple and prolonged burst of chemical.

41.     Sergeants D. LaTraille and J. Taber used a combination of three different types of pepper spray from an MK-9, MK-46 and Z-505 Canisters.

42.     Sergeants LaTraille and Taber aimed for Plaintiff's body generally and the spray landed on his arms, legs, sides, shoulders, back, buttocks and genitals. Even after Mr. Rangel picked himself off the ground, put his hand up, and told them "I'm done", one of the sergeants continued to spray Mr. Rangel and, in fact, emptied almost an entire crowd-sized canister on Mr. Rangel in a period of 15 seconds AFTER he agreed to submit to the public strip search. The Sergeant stopped only after Mr. Rangel screamed "alright, I said alright!"

///

///

43.     Mr. Rangel was blinded by the pepper spray and every inch of his body was burning. He was choking and gagging from the fumes. He could not see and he could not breathe. He was told to remove his clothing.

44.     He stripped down and gave his clothing to the officers for inspection. He was escorted from the cage with his pepper spray soaked pants tied covering his genitals and buttocks.

45.     He was escorted by one male and one female officer to a grassy area where an officer placed icy cold water from an outdoor water hose on Mr. Rangel's front torso, head and neck for a period of 45 seconds.

46.     Mr. Rangel was not properly decontaminated.

47.     The Prison's policy manual (DUF-38) required that an inmate that was exposed to pepper spray be provided copious amounts of running water or fresh air after exposure to pepper spray.

48.     It was customary practice to provide an inmate with a shower after exposure to pepper spray.

49.     There were eight show stalls available in secure locations on each unit.

50.     There were two shower stalls per section pod area and there were three sections in a unit, plus there were two "hard yard" showers.

51.     Each extraction team (#1 and #2) was completing 4 pepper spray assaults each hour.

52.     The shower stalls were readily available for use for decontamination.

53.     Mr. Rangel was not subject to l5 minute bed checks as required by policy.

54.     Mr. Rangel was returned to his cell and all of his belongings had been removed from the cell including soap, towel, clothing, blanket, toilet paper, eating utensils had been removed from his cell. The only thing left in the cell was a bare mattress.

55.     Over the next 8 hours, Mr. Rangel suffered twitching, difficulty breathing, swelling and severe burning pain in his eyes, throat, and skin.

56.     As a result of the prison's removal of his belongings, Mr. Rangel was unable to properly decontaminate and the burning pain on his skin continued for a period of three days until he was able to properly decontaminate.

57.     Mr. Rangel sustained permanent red blotches on his head, neck and shoulder area. Mr. Rangel was treated with Vitamin D ointment.

**B.      Defendants' Undisputed Facts**

Defendants contend the following facts are undisputed:

1.      Plaintiff, Leonardo Rangel (CDCR No. K26398), was housed in the Security Housing Unit (SHU) at California State Prison – Corcoran ("COR") at all times materials to this civil action.

2.      Defendants LaTraille and Taber were employed by the California Department of Corrections and Rehabilitation (CDCR) at COR at times material to the claims at issue.

3.      Movement and inmate activities in the SHU are primarily governed by COR Operational Procedure No. 222. SHU inmates are provided with three to four hours of yard time in the exercise modules on the small management yard on Facility 4B. But inmates are not required to go to yard.

4.      Before August 2007, SHU inmates returning from the exercise modules were placed in a holding cell in the entrance area (also known as the rotunda) of the housing unit and underwent an unclothed body search.

5.      An unclothed body search consisted of an inmate removing all clothing and handing it to the officers, running his hands over his head, flipping his ears forward with his hands, running a finger through the inside of his mouth, lifting his genitals, turning and bending at the waist, and squatting and coughing. The officers did not physically touch the inmate, and the entire process lasted about a minute.

6.      On August 1, 2007, D. Adams, the Warden at COR, issued a directive requiring that all SHU inmates undergo an unclothed body search before they were removed from the exercise modules, as opposed to being searched in the rotunda area. This search policy went into effect on August 20, 2007.

7.      The change in location of the unclothed body search was necessary to control and prevent the movement of contraband within the SHU and to protect the institution, staff, and inmates.

8.      The small management yard was deemed a high-risk area. Movement to and from the exercise modules and yard time provided inmates with the opportunity to commit assaults, relay information or threats, plan illegal activities, and exchange or obtain weapons or contraband. Conducting an unclothed body search before the inmate was removed from the exercise module reduced the potential for assaults with a weapon and reduced the dissemination of contraband.

///

7

9. Unclothed body searches inside the housing unit were insufficient to protect staff and inmates from assaults or to prevent the movement of contraband. If an inmate was not searched before he was removed from the exercise module, he could stab an officer or another inmate, disseminate illegal information, or pass drugs or other contraband at any point from the time he was removed from the exercise module to the time he was searched in the housing unit. A search at the exercise module reduced the risk of, and protected staff and inmates from, unlawful activity during the course of the escort.

10. The only difference between the unclothed body searches before and after August 20, 2007, was the location of where the search was conducted.

11. A cell extraction procedure calls for windows to be covered.

12. In October 2007, Operational Procedure No. 222 was revised to incorporate Warden Adams' change to the unclothed body search policy. Due to some ambiguity in the policy's language, Adams issued another addendum in April 2008 to clarify that the search was to be conducted before the inmate exited the exercise module.

13. Around noon on March 15, 2008, Plaintiff was escorted to the small management yard on Facility 4B and placed in an exercise module.

14. At around 3:30 or 4 p.m., Officer Silva ordered Plaintiff to submit to an unclothed body search before exiting the exercise module. Plaintiff refused to comply with the officer's order.

15. In addition to Plaintiff, 74 other inmates refused to submit to the required unclothed body search as a protest to the change in the search policy and its purported inconsistent enforcement and implementation.

16. Lieutenant Hubach ordered staff to counsel the inmates and persuade them to comply with the lawful orders to submit to the required search.

17. Hubach also notified his supervisors of the inmates' disruption to the yard program and schedule.

18. By the late evening on March 15, 2008, 67 inmates, including Plaintiff, still refused to comply with staff's orders to submit to the required search.

///

19.     At approximately 10:40 p.m., Administrative Officer of the Day (AOD) Leon assembled two tactical teams to extract the inmates from the exercise modules, and he authorized the use of pepper spray to compel the inmates' compliance with lawful orders to submit to a strip search before exiting the exercise modules.

20.     Hubach was the team leader of Extraction Team 1, which included Sergeants LaTraille and Taber.

21.     At approximately 2:28 a.m. on March 16, 2008, Hubach approached Plaintiff's exercise module and read Plaintiff an admonishment to submit to an unclothed body search or he would be forcefully removed from the module.

22.     Hubach ordered Plaintiff to submit to the required search. Plaintiff refused to comply with Hubach's order.

23.     Hubach ordered LaTraille and Taber to use minimal amount of force to compel Plaintiff's compliance with his order.

24.     Plaintiff was wearing a tee shirt pulled up over his head, and boxer shorts, and was in a tucked position on the ground with his arms over his head.

25.     LaTraille and Taber used multiple bursts of pepper spray from an MK-9, MK-46, Z-505, or a combination of these types of spray on Plaintiff.

26.     Due to the extent Plaintiff was covered up, LaTraille and Taber aimed for Plaintiff's body generally, and the spray landed on his arms, legs, sides, and back. Plaintiff covered the majority of his upper body and head with his prison jumpsuit.

27.     On at least one occasion, Defendants Taber and LaTraille stopped spraying to give the pepper spray a chance to work, and asked Plaintiff if he was going to comply. Plaintiff swore at them, indicated he was not, and Defendants resumed spraying him.

28.     After two or three more bursts of spray, Plaintiff finally agreed to submit to the required search.

29.     Overall, LaTraille and Taber intermittently dispersed pepper spray on Plaintiff for approximately one and a half minutes until he agreed to submit to the required search. As soon as Plaintiff agreed to comply, Defendants stopped using pepper spray.

30.     LaTraille and Taber conducted the unclothed body search of Plaintiff, and Plaintiff was escorted to an area outside the housing unit for decontamination and medical evaluation. While being escorted to the decontamination area, Plaintiff assured his fellow inmates that he was fine.

31.     Plaintiff was provided with cool running water from a water hose for approximately 20 seconds, and when he advised LaTraille and Taber that certain areas were burning, they moved the hose to that area of Plaintiff's body to relieve the burning and remove the pepper spray.

32.     Plaintiff did not indicate or tell prison staff that he needed more water or required further decontamination or medical attention before he was escorted to his cell.

33.     Plaintiff was taken to his cell after his medical evaluation, where he had water from the sink to further decontaminate and remove any pepper spray that was still on his skin.

## C.     Plaintiff's Disputed Factual Issues

1.     Mr. Rangel did not, at any time, refuse to comply with Officer Silva's orders at any time. He communicated his willingness to submit to a strip and cavity search.

2.     Plaintiff agreed to cuff up and be taken indoors to the Rotunda Holding Cell to submit to a strip and visual cavity search before returning to his cell.

3.     Plaintiff did not move but remained in a fetal position on the floor of the exercise cage until he stood up and told the officers "I'm done." He then took his head out of his jumpsuit and was blasted in the face and over his entire body.

4.     The videotape depicts that one of the defendants continued to spray Mr. Rangel for l5 seconds after he surrendered.

5.     LaTraille and Taber intermittently disbursed 7 canisters of pepper spray on Plaintiff over a 3.5 minute time period.

6.     Officers did not conduct a full strip search following the assault.

7.     While Mr. Rangel was being escorted to the decontamination area, he told his fellow inmates that he was hurt.

8.     At the medical evaluation, Mr. Rangel advised the nurse that he was not OK, that his skin was on fire and he needed decontamination. Nothing was done.

///

9.    CS is a chemical spray that is generally used only by members of the special emergency response team.

10.    CS is not intended to be used on a non-combative prone inmate.

### D.    Defendants' Disputed Factual Issues

1.    Whether Defendants LaTraille and Taber used more force than was necessary to compel Plaintiff's compliance with a lawful order to submit to an unclothed body search.

2.    Whether Defendants Latraille and Taber used force in a good faith effort to maintain or restore discipline.

3.    Whether Plaintiff suffered more than *de minimis* injuries.

4.    Whether Plaintiff suffered any long-lasting medical effects as a result of his exposure to pepper spray.

### E.    Disputed Evidentiary Issues[1]

#### 1.    Plaintiff's Disputed Evidentiary Issues

Plaintiff will request that the court order defendants, their counsel or witnesses, not to testify and/or disclose that Rangel was placed in the Special Security Unit due to an alleged association with the Mexican Mafia prison gang. Mr. Rangel is not a gang member or associate to any prison gang. This is irrelevant to the issues set forth herein. Introduction of this evidence would be more prejudicial than probative under the circumstances presented here.

#### 2.    Defendants' Disputed Evidentiary Issues

Evidence should be excluded when it lacks relevance, consists of hearsay, is mere opinion, has not been authenticated, or when its probative value is substantially outweighed by the danger of unfair prejudice, confusion or needless delay. Fed R. Evid. 402, 403, 602, 701, 802, 901(b). Defendants object to any evidence submitted by Rangel based upon or containing inadmissible hearsay, or evidence that is irrelevant, immaterial, or incompetent.

Defendants will contest the admissibility of any written statements by inmates whom Rangel claims are witnesses including, but not limited to, any statement signed by said inmates.

---

[1]    The parties may file motions in limine, addressed below, and/or object to the introduction of evidence at trial.

Defendants object to any opinion testimony from Rangel regarding any matters that call for medical expertise. Rangel should be precluded from offering at trial any and all testimony, reference to testimony, or argument relating to testimony, concerning any medical diagnoses Rangel received or the causation of these alleged injuries, in the form of an expert opinion which Rangel is not qualified to give. Specifically, Rangel must be barred from offering his own opinion testimony concerning his claimed injuries and his contention that they resulted from Defendants' actions. Because Rangel is not a medical expert, any opinion testimony he could offer concerning his medical diagnoses or the cause of his injuries are precluded under Federal Rules of Evidence 701 through 703. Thus, Rangel must be precluded at trial from providing medical opinion testimony.

Should Rangel or any other incarcerated witnesses testify, Defendants will seek to impeach such witnesses by presenting evidence of prior felony convictions, under Federal Rule of Evidence 609. The verdict in this case will be affected by the credibility of witnesses. Therefore, Defendants argue that no one who has suffered a prior felony conviction is entitled to the false aura of veracity which would occur if impeachment were not allowed. Defendants will only present evidence of the number of felony conviction(s) of witnesses and the length of the sentence for such conviction(s), but not the nature of the conviction(s).

Defendants reserve objections to specific testimony and exhibits until such time as Defendants have had the opportunity to hear such testimony and examine such exhibits.

Defendants will also file specific objections to Rangel's exhibits once they have been exchanged with Defendants.

**F.     Special Factual Information**

**1.     Defendants' Special Factual Information – Tort –
Actions for Personal Injury**

1.     Rangel alleges that his skin stung for three days as a result of being pepper sprayed.

2.     At the time of the incident, Mr. Rangel was a 45-year-old prisoner, incarcerated at COR. Plaintiff has since been released, but Defendants are unaware of his current employment status. All of the medical treatment received by Rangel following this incident was provided by the Defendants' employer, the California Department of Corrections and Rehabilitation.

**IV.     Relief Sought**

Plaintiff seeks compensatory and punitive damages, declaratory relief, permanent and preliminary injunctive relief, attorney's fees and costs, and other relief as the Court deems proper.

Defendants pray for judgment in their favor, with Rangel taking nothing, an award of costs, and such other relief as the Court deems proper.

**V.     Points of Law**

**A.     Imposition of Liability Under Section 1983**

Under section 1983, Plaintiff is required to prove that each defendant (1) acted under color of state law and (2) deprived him of rights secured by the Eighth Amendment of the United States Constitution. <u>Long v. County of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiff must prove that each defendant personally participated in the deprivation of his rights. <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). "A supervisor is liable under § 1983 for a subordinate's constitutional violations 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.'" <u>Maxwell v. Cnty. of San Diego</u>, 708 F.3d 1075, 1086 (9th Cir. 2013) (quoting <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989)). There is no respondeat superior liability under section 1983, and each defendant is only liable for his own misconduct. <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1948-49 (2009).

**B.     Eighth Amendment – Excessive Force Claim**

The relevant inquiry for this Eighth Amendment claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 67, 112 S. Ct. 995, 998 (1992); <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 1085 (1986). In making this determination, the court may evaluate "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." <u>Whitley</u>, 475 U.S. at 321, 106 S. Ct. at 1085; <u>Marquez v. Gutierrez</u>, 322 F.3d 689, 692 (9th Cir. 2003). Prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Whitley</u>, 475 U.S. at 321-22 (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1970)).

1    While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not

2    end it. Hudson, 503 U.S. at 7. The malicious and sadistic use of force to cause harm always violates

3    contemporary standards of decency. Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9)

4    (quotation marks omitted). Thus, it is the use of force rather than the resulting injury which ultimately

5    counts. Wilkins, 130 S. Ct. at 1178.

6    **C.    Qualified Immunity**

7    The doctrine of qualified immunity protects government officials from civil liability where

8    "their conduct does not violate clearly established statutory or constitutional rights of which a

9    reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815,

10   172 L .Ed .2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73

11   L. Ed. 2d 396 (1982)). Qualified immunity protects "all but the plainly incompetent or those who

12   knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L. Ed. 2d

13   1149 (2011) (citations omitted).

14   To determine if an official is entitled to qualified immunity the court uses a two part inquiry.

15   Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155, 150 L. Ed. 2d 272 (2001) overruled in part

16   by Pearson, 555 U .S. at 236, 129 S. Ct. at 818. The court determines if the facts as alleged state a

17   violation of a constitutional right and if the right was clearly established at the time of the challenged

18   conduct. Ashcroft, 131 S.Ct. at 2080. This does not require that the same factual situation must have

19   been decided, but that existing precedent would establish the statutory or constitutional question

20   beyond debate. Id. at 2083; Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011). The inquiry as to

21   whether the right was clearly established is "solely a question of law for the judge." Dunn v. Castro,

22   621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep' t., 556 F.3d

23   1075, 1085 (9th Cir. 2009)). District courts are "permitted to exercise their sound discretion in

24   deciding which of the two prongs of the qualified immunity analysis should be addressed first in light

25   of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S. Ct. at 818.

26   "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that

27   a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 536

28   U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) (citation omitted). Official action is

entitled to protection "unless the very action in question has previously been held unlawful." <u>Hope</u>, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," <u>Clement v. Gomez</u>, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," <u>Hope</u>, 536 U.S. at 741. The salient question is whether the state of the law at the time gave defendants fair warning that their alleged treatment of plaintiff was unconstitutional. <u>Id</u>.

### D.     State Law Assault and Battery

Under California law, "[a]n assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another" and "[a] battery is any willful and unlawful use of force or violence upon the person of another."  Cal. Penal Code § 240, 242 (West 2014).  For an assault claim under California law, a plaintiff must show that (1) the defendant threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to the plaintiff that the defendant was about to carry out the threat; (3) the plaintiff did not consent to the conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the harm.  <u>Tekle v. United States</u>, 511 F.3d 839, 855 (9th Cir. 2007) (citation omitted).  For battery, a plaintiff must show that (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person; (2) the plaintiff did not consent to the contact; and (3) the contact caused injury, damage, loss, or harm to the plaintiff.  <u>Id</u>. (citation and quotations omitted).

### E.     Punitive Damages

Plaintiff has the burden of proving what, if any, punitive damages should be awarded by a preponderance of the evidence. NINTH CIRCUIT MODEL CIVIL JURY INSTRUCTIONS § 5.5 (2008). The jury must find that Defendants' conduct was "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56, 103 S.Ct. 1625 (1986). Acts or omissions which are malicious, wanton, or oppressive support an award of punitive damages. <u>Dang v. Cross</u>, 422 F.3d 800, 807-08 (9th Cir. 2005).

### F.     Federal Rules of Evidence

Federal Rule of Evidence 609 provides that evidence of a witness's prior felony conviction may be used to impeach that witness's testimony. Fed. R. Evid. 609.

15

Federal Rule of Evidence 404(b) provides that evidence of prior crimes, wrongs, or acts cannot be used to prove the character of the person in order to show conduct in conformity with that character trait. Fed. R. Evid. 404(b). Such prior acts may be admissible for other purposes only, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id.

## VI.    **Abandoned Issues**

Defendants abandon the defense that any part of Plaintiff's excessive force claim is barred by Heck v. Humphrey, 512 U.S. 477, 487 (1994).

## VII.   **Witnesses**

**The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.   NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 281(b)(10).**

### A.    **Plaintiff's Witness List**[2]

1.    Plaintiff Leonardo Joseph Rangel

2.    Pascual Gosslin

3.    Carlos Villegas

4.    Bobby LaStourgeon

5.    Lieutenant Hubach

6.    Officer Silva

7.    Defendant Sergeant LaTraille

8.    Defendant Sergeant Taber

9.    Sergeant C. Byrum

10.   Sergeant Anderson

11.   Lieutenant Weaver

---

[2]     Plaintiff is not required to call all of the witnesses listed.  However, witnesses the parties plan to call must be available on May 3, 2016, by 9:30 a.m. The Court will not delay the proceedings because of witness unavailability.

12.     Correctional Officer E. Torres

13.     Thomas R. Maeweather (proposed expert witness)

**B.     Defendants' Witness List**[3]

1.     Defendant LaTraille

2.     Defendant Taber

3.     CDCR Lieutenant Hubach

4.     D. Leon

5.     CDCR Facility Captain M. Jennings

6.     CDCR Associate Warden R. Davis

7.     CDCR Use of Force Analyst D. Shearer

8.     CDCR Warden D. Adams

9.     Dr. J. Jim, M.D.

10.     CDCR Lieutenant A. Diaz (proposed expert witness)

11.     A. Enenmoh, M.D. (proposed expert witness)

12.     Custodian of Rangel's central file and medical records.[4]

**VIII.   Exhibits**

     The following is a list of documents or other exhibits that the parties expect to offer at trial. **NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 281(b)(11).**

**A.     Plaintiff's Exhibits**

1.     Crime/Incident Report, Page 1-48, Dated 8/8/08

---

[3]     Defendants are not required to call all of the witnesses listed.  However, witnesses the parties plan to call must be available on May 3, 2016, by 9:30 a.m. The Court will not delay the proceedings because of witness unavailability.

[4]     Defendants may have the custodian of records authenticate the documents by written declaration to avoid undue expense only if the custodian also is willing to stipulate to the authenticity of any CDCR documents from Plaintiff's central file that Plaintiff intends to offer at trial. If the custodian is unwilling to stipulate, the custodian of records shall appear at trial and shall be available for Plaintiff to call. (The documents may still be objected to on other grounds.)

2.      Medical Report of Injury or Unusual Occurrence, Rangel, Dated: 3/15/08

3.      Chapter 17 Oleoresin Capsicum Contraindications Division of Correctional Health Care Services, January 2006

4.      Chapter 18 of the Division of Correctional Health Care Service Medical Evaluation of Inmate-Patients Involved in Assaults, Cell Extraction or Use of Force. Dated: January 2006

5.      Defendants Taber's Response to Plaintiff's Interrogatories, Set One-Rangel, Dated: 05/16/12

6.      Defendant Taber's Response to Plaintiff' Request for Admissions, Set One-Rangel, Dated: 08/21/12

7.      Defendant Tabers Response to Form Interrogatories 17.1, Set One-Rangel, Dated: 05/16/12

8.      Defendant LaTraille's Response to Plaintiff's Form Interrogatories, Set One-Rangel, Dated: October 18, 2012

9.      Defendant LaTraille' Response to Plaintiff's Request for Admissions, Set One-Rangel, Dated: 05/12/12

10.     Defendant Tabers Response to Plaintiff's Interrogatories, Set One LeStourgeon, Dated: May 16, 2012

11.     Defendant Taber's Response to Plaintiff's Request for Admissions, Set One-LeStourgeon, Dated: August 21, 2012

12.     Defendant Taber's Resonse to Form Interrogatory l7.1, Set One-Le Stourgeon, Dated August 21, 2012

13.     Defendant LaTraille's Response to Plaintiff's Interrogatories, Set One-LeStourgeon, Dated May 16, 2012

14.     Defendant LaTraille's Response to Plaintiff's Request for Admissions, Set One–LeStourgeon, Dated: October 18, 2012

15      Defendant La Traille's Response to Plaintiff's Form Interrogatory 17.1, Set One-LeStourgeon, Dated: October 18, 2012

16. Declaration of D. Leon, Rangel vs. D.Latraille, et.al., Dated:  [No date provided]

17.     Declaration of D. Adams, Dated: May 30, 2013

18.     Declaration of R. Hubach, Rangel vs. D. Latraille, Dated: June 4, 2013

18

19.     Declaration of D. Latraille, Rangel vs. D. Latraille, et.al. Dated: [No date provided]

20.     D. Latraille, Annual Audit of Training, 01/01/07-05/02/12

21.     Declaration of J. Taber, Rangel vs. D. Latraille, et.al.

22.     J. Taber, Annual Audit of Training, 01/01/00-05/02/12

23.     Post Assignment Orders for the California Department of Corrections, California State Prison–Corcoran, October 2008

24.     Declaration of Bobby LeStourgeon, Dated 12/14/11

25.     Declaration of Sergio Rubio, Dated 12/18/11

26      Declaration of Carlos Villegas, Dated 9/8/10

27.     Declaration of Carlos Villegas, Dated 6/26/13

28.     Declaration of P. Gosselin, Dated 7/29/12

29.     Declaration of Arthur Guzman, Dated 10/18/10

30.     Inmate/Parolee Appeal Form, Arthur Guzman, Dated 4/23/08

31.     Basic Correctional Officers Academy Lesson Plan–Chemical Agents

32.     California Dept. Of Corrections Operational Procedure Number 1053, Oleoresin Capsicum Contraindications

33.     California Department of Corrections & Rehabilitation Operational Procedure No. 010, Cell/Area Extractions

34.     Cocoran Prison Operational Procedure No. 222, Dated October 2007

35.     Cocoran Prison Operational Procedure No. 222, Dated October 2006

36.     California State Prison–Cororan Institutional Executive Review of Use of Force Critique and Qualitative Evaluation Analysis.

37.     Corcoran State Prison Use of Force

38.     Crime/Incident Report Critique Package

39.     CDCR 989 Confidential Request for Internal Affairs Investigation. October 10, 2008

40.     Informal Inquiry to the actions of Sergeant Martinez–Utilizing emergent force in a situation that should have been handled as a calculated use of force, Dated 9/08

///

41.     California Department of Corrections & Rehabilitation Memorandum dated June 12, 2008, Executed by: Debbie Shearer, Use of Force Analyst/Coordinator

42.     Memorandum to D. Shearer by R Hubach dated June 26, 2008

43.     Cell/Area Extraction Admonishment, Leonardo Joseph Rangel

44.     Cell Extraction Scribe Sheet, Leonardo Joseph Rangel

45.     Captain's Incident Report Audit Sheet, April 21, 2008

46.     All videotapes depicting the use of force extraction of inmates from the Exercise Yard on March l5 and March 16, 2008, at the California State Prison–Cocoran

47.     All Press Releases regarding the use of force extraction of inmates from the Exercise Yard on March l5 and March l6, 2008, at the California State Prison–Cocoran.

48.     All News articles regarding the use of force extraction of inmates from the Exercise Yard on March l5, and March l6, 2008 at the California State Prison–Cocoran

49.     Memorandum Re: Unclothed Body Searches in the Security Housing Unit, Dated August 1, 2007, Executed by Darral G. Adams

50.     The complete medical file for plaintiff Leonardo Joseph Rangel, including all photographs, x-rays and confidential information.

51.     Addendum to Operational Procedure 222, Signed by Darral G. Adams in August 2007

52.     Addendum to Operation Procedure 222, Signed by Darral G. Adams in April 2008

53.     Group 602 Appeal filed by John Martinez in February 2008

54.     Department of Corrections and Rehabilitation, Title l5, Section 3287–Cell, Property and body inspections.

55.     Department of Corrections and Rehabilitation, Section 52050.16.5-Unclothed body searches of inmates

**B.     Defendant's Exhibits**

1.     Abstract of Judgment representing Rangel's felony conviction(s) and sentence(s)

2.     Abstract(s) of Judgment representing felony conviction(s) and sentence(s) of Rangel's inmate witnesses (if any)

3.     Plaintiff's CDCR chronological movement history

4.      CDCR Rules Violation Report Log No. COR-4B-08-03-062 dated March 25, 2008, issued to Rangel for willfully delaying a peace officer

5.      CDCR 837 Crime/Incident Report for Rangel issued March 15, 2008

6.      CDCR 7219 Medical Report of Injury or Unusual Occurrence dated March 16, 2008, regarding Plaintiff Rangel

7.      Diagrams and photographs of all of the areas of the prison where the alleged incident took place on March 15-16, 2008, including but not limited to, CSP-Corcoran SHU, Facility 4B, the exercise modules, the sally port, and B Facility Program Office area

8.      Videotape of extraction of exercise modules from March 15-16, 2008

9.      Crime/Incident Report Critique Packages, Incident Report Number COR-04B-08-03-0126 and related use of force reviews by CDCR

10.     Relevant portions of Rangel's prison medical records from January 1, 2008 through the present

11.     Isolation Log Book for 4B3R for March 13-16, 2008

12.     Memorandum Regarding Unclothed Body Searches in SHU dated August 1, 2007; authored by Warden Adams

13.     Addendum to Operational Procedure 222, dated August 2007 and signed by Warden Adams

14.     Addendum to Operational Procedure 222, dated April 2008 and signed by Warden Adams;

**IX.    Discovery Documents to be Used at Trial**

        Defendants will not offer any discovery documents.

**X.     Further Discovery or Motions**

        The parties anticipate filing motions in limine.

**XI.    Stipulations**

        Defendants have stipulated that they were acting under color of law at all times relevant to this action. The Court accepts this stipulation.

        Defendants are also prepared to stipulate that the parties need not introduce evidence to prove any of the facts that they contend are undisputed, as set forth in **Section III.B.**, above.

**XII.   Amendments/Dismissals**

        None.

**XIII.   Settlement Negotiations**

At the telephonic conference, the parties indicated that a settlement conference may be helpful. The parties will select three mutually convenient dates and contact the Courtroom Deputy to arrange a date.

**XIV.   Agreed Statement**

None.

**XV.   Separate Trial of Issues**

Defendants request that the issue of punitive damages be bifurcated.

As is the Court's general practice, the punitive damages phase, if any, will be bifurcated.

**XVI.   Impartial Experts – Limitation of Experts**

None.

**XVII.   Attorney's Fees**

Plaintiff, seeks attorney's fees and costs. Any such award shall be limited by the relevant provisions of 42 U.S.C. § 1997e(d).

Defendants may seek reasonable attorney's fees and costs if they prevail at trial.

**XVIII.   Trial Exhibits**

No special handling.

Defendants have possession of the video recordings that Plaintiff seeks to introduce and will provide copies to the Court at the commencement of trial.

**XIX.   Trial Protective Order**

None.

**XX.   Miscellaneous**

   **A.   Further Trial Preparation**

      **1.   Motions in Limine**

         **a.   Briefing Schedule**

Any party may file a motion in limine, which is a procedural mechanism to limit in advance testimony or evidence in a particular area. United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009) (quotation marks omitted). In the case of a jury trial, the Court's ruling gives Plaintiff and Defendants'

counsel advance notice of the scope of certain evidence so that admissibility is settled before attempted use of the evidence before the jury. Id. at 1111-12 (quotation marks omitted).

Any motion in limine must be served on the other party, and filed with the Court by **March 21, 2016**. Any motion in limine must clearly identify the nature of the evidence that the moving party seeks to prohibit the other side from offering at trial.

Any opposition to a motion in limine must be served on the other party, and filed with the Court by **March 29, 2016**.  **No reply briefs shall be submitted by the parties.**

An order may be issued prior to trial resolving these motions. Otherwise, a motion in limine hearing will be held, telephonically, on **April 19, 2016 at 10:00 a.m.** in Courtroom 8 (BAM).

**Whether or not a party files a motion in limine, that party may still object to the introduction of evidence during the trial.**

### 2. Other

#### a. Trial Briefs

The parties are relieved of their obligation under Local Rule 285 to file a trial brief. If the parties wish to submit a trial brief, they must do so on or before **April 19, 2016**.

#### b. Verdict Form

The Court will prepare the verdict form, which the parties will have the opportunity to review on the morning of trial. If the parties wish to submit a proposed verdict form, they must do so on or before **April 19, 2016**.

#### c. Jury Instructions

The Court will prepare the jury instructions, which the parties will have the opportunity to review on the morning of trial. **The parties shall also meet and confer, by telephone or other means, to agree upon jury instructions for use at trial.** The parties shall file and serve all agreed-upon jury instructions, and identify them as such, by no later than **April 19, 2016**.

Jury instructions that the parties could not agree on may be filed and served by no later than **April 19, 2016**. Plaintiff may file and serve no more than ten proposed jury instructions and identify them as instructions upon which the parties could not agree.  Similarly, Defendants may file and serve no more than ten proposed jury instructions and identify them as instructions upon which the parties

could not agree. Without a prior order, the Court will not consider additional proposed jury instructions beyond the first ten.

All jury instructions shall indicate the party submitting the instruction (e.g., Plaintiff or Defendants), the number of the proposed instruction in sequence, a brief title for the instruction describing the subject matter, the text of the instruction, and the legal authority supporting the instruction. **The parties shall provide the Court with a copy of their proposed jury instructions in Word format, agreed and not jointly agreed upon, via e-mail at: bamorders@caed.uscourts.gov.**

The parties shall use Ninth Circuit Model Civil Jury Instructions to the extent possible. Ninth Circuit Model Jury Instructions SHALL be used where the subject of the instruction is covered by a model instruction. Otherwise, BAJI or CACI instructions SHALL be used where the subject of the instruction is covered by BAJI or CACI. All instructions shall be short, concise, understandable, and neutral and accurate statements of the law. Argumentative or formula instructions will not be given and must not be submitted. Quotations from legal authorities without reference to the issues at hand are unacceptable.

The parties shall, by italics or underlining, designate any modification of instructions from statutory or case authority, or any pattern or form instruction, such as the Ninth Circuit Model Jury Instructions, BAJI, CACI, or any other source of pattern instructions. The parties must specifically state the modification made to the original form instruction and the legal authority supporting the modification.

The Court will not accept a mere list of numbers of form instructions from the Ninth Circuit Model Jury Instructions, CACI, BAJI, or other instruction forms. The proposed jury instructions must be in the form and sequence which the parties desire to be given to the jury. All blanks to form instructions must be completed. Irrelevant or unnecessary portions of form instructions must be omitted.

### d.    <u>Proposed Voir Dire</u>

Proposed voir dire questions, if any, shall be filed on or before **April 19, 2016**, pursuant to Local Rule 162.1.

24

e.      **Statement of the Case**

The parties may serve and file a non-argumentative, brief statement of the case which is suitable for reading to the jury at the outset of jury selection on or before **April 19, 2016**. The Court will consider the parties' statements but will draft its own statement. The parties will be provided with the opportunity to review the Court's prepared statement on the morning of trial.

f.      **Trial Exhibits**

The original and two (2) copies of all trial exhibits, along with exhibit lists, shall be submitted to **Courtroom Deputy Harriet Herman no later than April 19, 2016**. The parties shall also serve one (1) copy of all trial exhibits, along with their exhibit list, on each other no later than **April 19, 2016**. This includes any demonstrative evidence the parties intend to use. Plaintiff's exhibits shall be pre-marked with the prefix "PX" and numbered sequentially beginning with 100 (e.g., PX-100, PX-101, etc.). Defendants' exhibits shall be pre-marked with the prefix "DX" and numbered sequentially beginning with 200 (e.g., DX-200, DX-201, etc.). Exhibits which are multiple pages shall be marked with page numbers in addition to the prefix and exhibit number, on each page of the exhibit (e.g., PX-100, page 1 of 2, PX-100, page 2 of 2, etc.). Exhibits shall also be separated by tabs.

**The parties are required to meet and confer, by telephone or other means, to agree upon and identify their joint exhibits, if any.** Joint exhibits shall be pre-marked with the prefix "JT" and numbered sequentially beginning with 1 (e.g., JT-1, JT-2, etc.), and Defendants' counsel shall submit the original and two (2) copies of the joint trial exhibits, with exhibit lists, no later than **April 19, 2016**.

The parties shall make an appointment at last one (1) week ahead of trial with the Court's information technology specialists to discuss any exhibits, such as videotapes, requiring the use of technology to present to the jury. The parties may contact Courtroom Deputy Harriet Herman to obtain the necessary contact information.

**XXI.   Objections to Pretrial Order**

Written objections to the pretrial order, if any, must be filed on or before **March 29, 2016**. Such objections shall specify the requested modifications, corrections, additions or deletions.

///

**XXII.  <u>Compliance with Pretrial Order</u>**

Strict compliance with this order and its requirements is mandatory. The Court will strictly enforce the requirements of this pretrial order, and counsel and parties are subject to sanctions for failure to fully comply with this order and its requirements. The Court will modify the pretrial order "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). The Court ADMONISHES the parties and counsel to obey the Federal Rules of Civil Procedure and the Court's Local Rules and orders. The failure to do so will subject the parties and/or counsel to sanctions as the Court deems appropriate.


IT IS SO ORDERED.

Dated:   __**March 15, 2016**__          ___/s/ _Barbara A. McAuliffe____
UNITED STATES MAGISTRATE JUDGE